In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 25-1110

IN RE: BROILER CHICKEN ANTITRUST LITIGATION

CARINA VENTURES LLC,

*Plaintiff-Appellant,*

*v.*

PILGRIM'S PRIDE CORPORATION,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:16-cv-08637 — **Thomas M. Durkin**, *Judge.*

————————————

ARGUED NOVEMBER 13, 2025 — DECIDED FEBRUARY 5, 2026

————————————

Before EASTERBROOK, HAMILTON, and MALDONADO,
*Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal from a broader anti-
trust action asks whether two parties' settlement negotiations
produced a binding agreement in the absence of a formal, in-
tegrated, and signed writing that the parties contemplated.
The parties agreed here, at least in principle, that one plaintiff

would release its antitrust claims against one defendant in three cases in return for $50 million. But other terms were not agreed upon at the time of the critical exchange that ended with an email saying "We accept."

If material terms—terms either party deems essential—are left open to future negotiations, an initial agreement in principle cannot be binding for an entirely executory contract like this proposed settlement agreement. See *Ocean Atlantic Dev. Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983, 1000–01 (7th Cir. 2003); Restatement (Second) of Contracts § 34 cmt. c (1981) (contract is not enforceable before "preliminary manifestations" become definite terms).

This appeal turns on whether several terms left open at the time of the "We accept" email were material. Undisputed facts show that the parties treated those terms as material, and the open terms directly affected the value of the exchange at the heart of the proposed settlement. We therefore reverse the summary judgment in favor of defendant that was granted on the theory that the parties had in fact settled plaintiff's claims in this case. See generally *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 389 (7th Cir. 1999); *Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 426 (7th Cir. 1989).

I.  *Factual and Procedural Background*

A.  *The "Broilers" Litigation*

This contract dispute is an offshoot from a much larger multidistrict antitrust action alleging price-fixing in sales of broiler chickens. In September 2016, commercial and individual chicken purchasers filed suit alleging that industrial chicken producers conspired to raise broiler chicken prices. See *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772,

779–87 (N.D. Ill. 2017) (summarizing history of *Broilers* litigation). Two parallel class actions in the pork and beef industries are pending in the District of Minnesota. See *In re Pork Antitrust Litig.*, No. 18-cv-01776 (D. Minn.); *In re Cattle & Beef Antitrust Litig.*, No. 22-md-03031 (D. Minn.).

Defendant-appellee Pilgrim's Pride Corporation is a global producer and supplier of meat products, including broiler chickens. It is a defendant in all three cases. Sysco Corporation, the original plaintiff in this dispute, buys chicken, beef, and pork from Pilgrim's and was a plaintiff in all three cases. Complicating matters, Sysco obtained litigation funding from Burford Capital. One condition of that funding was that Sysco "shall not accept a settlement offer without [Burford Capital's] prior written consent, which shall not be unreasonably withheld."[1]

Early in the *Broilers* antitrust case, Pilgrim's and many other defendants entered into a "Judgment Sharing Agreement," which was a response to the joint and several liability that can apply to all conspirators under antitrust law. See, e.g., *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir. 1980). This agreement allows a *Broilers* defendant to settle with a plaintiff so as to escape possible joint and several liability for that plaintiff's claims against other defendants that succeed in the future. To gain that benefit, a settlement must be "qualified" under the Judgment Sharing Agreement.

---

[1] This funding agreement and other documents and briefs are under seal in the district court. All references to such documents in this opinion draw only from the parties' appellate briefs, which are not sealed, and from the public versions of documents filed in the district court.

To be qualified under the Judgment Sharing Agreement, a settling plaintiff must agree to subtract damages stemming from its purchases with the settling defendant in any later settlements with or judgments against other defendants. Particularly relevant here, to qualify under the Judgment Sharing Agreement, a settling defendant must provide written notice of its settlement to other Judgment Sharing Agreement defendants within seven days after executing that settlement. Pilgrim's is a party to the Judgment Sharing Agreement.

B. *Settlement Efforts*

Pilgrim's and Sysco began settlement discussions in April 2021. Most communications were between Sysco associate general counsel Barrett Flynn and Pilgrim's corporate counsel Ted Sangalis. Pilgrim's made offers in May and November 2021. Both offers attached certain amounts to Sysco's claims in each of the markets—at that time, only *Broilers* and *Pork*—and were conditioned on the full release of Sysco's claims. The November 2021 offer was expressly contingent upon any settlement complying with the Judgment Sharing Agreement. Sysco rejected both offers.

In early 2022, the parties tried to mediate their *Broilers* dispute and exchanged their relevant sales data. Pilgrim's said it would move forward using Sysco's sales numbers, subject to any assignments of Sysco's claims to third parties. In June 2022, Sysco made its first offer for global settlement of its chicken, beef, and pork claims. Sysco's offer allocated amounts among the three cases and contemplated the drafting of a formal settlement release in the following weeks. Pilgrim's countered with its own global settlement offer, also with amounts allocated among the three cases, subject to

obtaining Sysco's assignment data for each case. The parties could not agree on an overall dollar amount.

Then we get to the events at the center of this appeal. On August 24, 2022, Flynn and Sangalis spoke on the phone. They ended the call having reached an agreement, at least in principle, for Sysco to release its *Broilers*, *Beef*, and *Pork* claims for a total of $50 million. Following the call, Sangalis sent two emails to Flynn. First, later on August 24, Sangalis wrote: "We have a deal at $50M for settlement of Broilers, Pork, and Beef antitrust cases. Let me know the assignments in each case (prioritizing Broilers), and we will figure out the allocation and draw up the agreements." The next day, on August 25, Sangalis wrote Flynn again: "As discussed, I am confirming that JBS and Pilgrim's are offering $50M for a global settlement of Broilers, Pork, and Beef antitrust cases." On September 9, Flynn responded "We accept," and he requested that both parties' outside counsel connect "to work on the release." Sangalis answered: "Before we draft the releases, can you confirm the assignments in Broilers?"

This email exchange does not indicate agreement on any terms other than $50 million and releases of claims in all three cases. The parties disagree about which other terms had been agreed upon up to that point. Flynn testified that the $50 million agreement was an agreement in principle but was still subject to negotiation and mutual assent to other material terms and execution of a formal agreement. Flynn Decl. ¶ 8. Flynn said further that Pilgrim's did not communicate to him until two months later, in November 2022, that it needed the settlement agreement to be qualified under the Judgment Sharing Agreement. *Id.* at ¶ 10. Sangalis testified, however, that he and Flynn had agreed orally that any settlement

agreement would be "qualified" under the Judgment Sharing Agreement. Sangalis Decl. ¶ 17. Sangalis also testified that he and Flynn agreed in their phone call that the settlement would contain a "most favored nation" clause with language excluding certain categories of restaurants. *Id*.

Later communications between the parties show that negotiations continued on the following terms: assignments, allocations, a "most favored nation" clause, and Judgment Sharing Agreement compliance. Assignments were the amounts of Sysco's claims that it had assigned to other parties. Allocations were the percentages of the total settlement sum for each of the three chicken, beef, and pork cases based on the parties' valuation of each category of claims. The "most favored nation" clause would allow Sysco to recover additional money from Pilgrim's if Pilgrim's later settled on more generous terms with similarly situated *Broilers* plaintiffs. Pilgrim's would also have had to pay more money to plaintiffs it had settled with earlier if the Sysco agreement turned out to be more generous to Sysco than the earlier settlements. Judgment Sharing Agreement compliance would require a written agreement in which Sysco agreed to waive joint and several liability against Pilgrim's in any future settlements with or judgments against other *Broilers* defendants.

After Flynn's "We accept" email on September 9, 2022, Pilgrim's took the first stab at drafting a settlement agreement. Pilgrim's asked Sysco to send its *Broilers* assignment data to Pilgrim's before it drafted the agreement. After Flynn sent the requested *Broilers* data, Sangalis also asked for assignment data for the *Beef* and *Pork* cases. The negotiators went back and forth about how to estimate the assignments of those claims based on the *Broilers* data as Flynn searched internally

for the *Beef* and *Pork* data. Two weeks later, Sangalis informed Flynn that the drafted agreements were almost ready for circulation and that he was waiting for an internal decision about the allocations among the three cases.

Sangalis sent Pilgrim's first drafts of the settlement agreements to Sysco on October 7, 2022, noting that the allocations in the agreements were not final and again asking for the assignment data for the *Beef* and *Pork* cases. That draft, like all drafts that would follow, contained an integration clause in which both parties agreed to refrain from bringing any claim based on an alleged agreement relating to this settlement agreement that was not in writing and signed by both parties. Flynn responded that the draft did not have a "most favored nation" clause and that Sysco required that clause be added. Sangalis then sent back a new *Broilers* draft agreement including a "most favored nation" clause. While Sysco awaited review of the draft from its outside counsel, Sangalis asked Flynn if he could also review the draft and return comments promptly, noting that Pilgrim's accounting department had been pressuring Sangalis to fully complete the deal.

In November 2022, the parties exchanged further drafts. These included edits to the "most favored nation" and Judgment Sharing Agreement clauses and definitions. Most striking for purposes of this appeal, Pilgrim's outside counsel sent an email to Flynn and Sysco's outside counsel threatening to walk away from the settlement in late November in response to Sysco's proposed edits narrowing the Judgment Sharing Agreement clause. Pilgrim's outside counsel also insisted that the proposed settlement ratio in the draft, a key factor in the "most favored nation" clause, was not final without confirmation of Sysco's assignment data.

After all of these continuing negotiations, in early December 2022, Sysco sent revised drafts to Pilgrim's, and Pilgrim's asked Sysco to move forward with executing and finalizing the settlement.

### C. *Burford Intervention*

In December, Burford Capital asserted its right under its agreement with Sysco to withhold its consent to this settlement. After the August 2022 phone call between Sangalis and Flynn, Sysco informed Burford of its discussion with Pilgrim's, characterizing the call and later communication as a global settlement offer. After learning about the negotiations and the $50 million global figure, Burford formally objected to settling on those terms.

In September 2022, Sysco's outside counsel communicated to Burford's chief investment officer that Sysco viewed the deal as nearly complete and just in need of being written and formalized. Worried that Sysco was on the brink of executing a formal settlement agreement, Burford filed an expedited request for arbitration with the tribunal designated by its funding agreement with Sysco to resolve their disputes.

Contrary to this comment that Sysco considered the deal nearly complete, Sysco continued to tell Burford that it was still in the negotiations phase. In October 2022, Sysco told Burford that it had reached an understanding with Pilgrim's but that there was not yet agreement as to all material terms nor an executed agreement. In November 2022, Sysco reiterated to Burford that it had not executed any settlement agreements and that it would notify Burford before doing so. In early December 2022, Sysco shared a draft of the *Broilers* settlement agreement with Burford, saying it was still a draft in progress.

Things changed when Sysco notified Burford on December 12, 2022, of its intent to execute the settlement agreement by the end of the year. Burford swiftly moved for a temporary restraining order and preliminary injunction from the arbitral tribunal to prevent Sysco from executing the agreement. The tribunal issued an arbitral TRO on December 14, 2022.

That same day, Sysco's Flynn called Pilgrim's Sangalis and told him Burford had won a TRO that meant Sysco could not finalize the settlement. Flynn detailed his expected timeline of Sysco's arbitration with Burford and said he wanted to continue to finalize the draft agreements so they could be executed promptly if injunctive relief were lifted. Accordingly, Sysco and Pilgrim's continued to make small edits to the draft agreements, including adding language about the ongoing Burford arbitration. On December 22, 2022, Pilgrim's sent final versions of the agreements for Sysco to execute.

Flynn testified that in January 2023, Pilgrim's followed up with Sysco, saying it would not keep its settlement offer open indefinitely. Flynn also testified that Pilgrim's communicated a desire to pursue litigation if the TRO were not lifted. There is ambiguity as to whether Pilgrim's threat was to continue litigating the antitrust claims or to ask the court to enforce a settlement it would argue already existed. Flynn sent another draft in February 2023, making a small change to language in the release provision, which Sangalis accepted.

In March 2023, after a multi-day evidentiary hearing, the arbitral tribunal issued a preliminary injunction preventing Sysco from executing the proposed settlement agreements. That same day, Pilgrim's outside counsel reiterated a commitment to settlement on the parties' already negotiated terms because of the ongoing business relationship between

Pilgrim's and Sysco. He did not assert that a binding agreement was in place, and the draft settlement agreements remained unsigned.

In June 2023, Burford and Sysco entered into a settlement to resolve their disputes with each other. As part of the settlement, Sysco assigned its claims in the *Broilers*, *Beef*, and *Pork* cases to Burford's affiliate, Carina Ventures LLC, which is now the plaintiff-appellant in this appeal.

### D. *Procedural History*

During the negotiations over a written agreement, in October 2022, Pilgrim's moved for summary judgment in the *Broilers* case against the last remaining "Track 1" plaintiff with a claim against Pilgrim's. See *In re Broiler Chicken Antitrust Litig.*, 133 F.4th 761, 763 (7th Cir. 2025) (explaining difference between Track 1 and Track 2 plaintiffs). The district court denied Pilgrim's motion in June 2023, increasing the value of the Track 2 plaintiffs' claims, which included Sysco's claims that it had assigned to Carina.

Then, on September 9, 2023, a year after the "We accept" email, Pilgrim's moved to enforce the *Broilers* settlement agreement. Its motion argued that the "We accept" email had created a binding settlement agreement on September 9, 2022. Pilgrim's asserted that when Flynn sent that email, the parties had already agreed on all material terms of the agreement. Carina opposed the motion, arguing that neither Sysco nor Pilgrim's had intended to be bound by the September 2022 email exchanges and that several material terms had not been resolved as of September 9, 2022.

The district court granted Pilgrim's motion to enforce. The court wrote that the "heart" of the agreement, and its only two

material terms, was the release of all claims in exchange for the $50 million global sum, to which both parties had assented. The district court also relied on the finalized draft agreements, which it said memorialized the parties' agreement on additional, immaterial terms, even though the drafts were never signed. The district court rejected Carina's laches argument that Pilgrim's had waited too long to enforce the agreement and its jurisdictional argument that the court could not enforce a global settlement agreement that involved *Beef* and *Pork* claims pending in a different court.

Carina tried to appeal the district court's decision then, arguing that it operated as an injunction. This court dismissed that appeal, finding that the decision did not operate as an appealable injunction so that we lacked jurisdiction to review it. *In re Broiler Chicken Antitrust Litig.*, Nos. 24-2100 & 24-2202, 2024 WL 5153588, at *1 (7th Cir. Aug. 14, 2024).

On July 22, 2024, Pilgrim's sent a total of $50 million in three separate checks to Sysco, one for each of Sysco's *Broilers*, *Beef*, and *Pork* settlements, with amounts corresponding to the allocations in the unexecuted settlement agreements. Sysco deposited the checks and transferred the funds to Carina. Carina maintains, however, that the payments were not valid under the settlement draft agreement, that they did not affect its right to pursue this appeal, and that it stands ready to return the money to Pilgrim's.

Pilgrim's then moved for summary judgment on Carina's *Broilers* claims. Although the motion was not framed this way, it amounted to a motion for summary judgment on a new affirmative defense of accord and satisfaction. In the judgment now before us, the district court granted Pilgrim's motion for summary judgment and entered a separate judgment under

Rule 54(b). The court relied on its earlier decision that a binding settlement agreement existed and found that Pilgrim's had fulfilled its obligations under the contract by paying the amount due. Pilgrim's then successfully moved for summary judgment on Carina's *Beef* and *Pork* claims in the District of Minnesota. Carina has appealed the *Broilers* judgment on the claims Sysco assigned to it.

## II. *Standard of Review*

The district court found, without holding an evidentiary hearing, that undisputed facts in the record demonstrated an unambiguous meeting of the minds on all material terms of the settlement agreement. As a result, we review de novo both the summary judgment order and the underlying decision to enforce. See *Newkirk v. Village of Steger*, 536 F.3d 771, 774 (7th Cir. 2008)**.**

## III. *Material Terms*

Defendant Pilgrim's presents the settlement here as a simple exchange: $50 million for releases of all of Sysco's antitrust claims against it. Any other terms, it contends, were not actually material. The parties' negotiations and actions refute that theory. Four terms that the parties negotiated for months after September 9, 2022, directly affected the value of the deal and the scope of the release, showing that these terms were both material and unresolved at the time of the initial agreement. Those terms were compliance with the Judgment Sharing Agreement, the scope of Sysco's assignments, the most favored nation clause, and the allocations among the three cases.

Illinois law requires mutual assent to all material terms before an agreement can be said to have a binding effect. *Abbott*

*Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999), citing *SBL Assocs. v. Village of Elk Grove*, 617 N.E.2d 178, 182 (Ill. App. 1993); *Beverly v. Abbott Laboratories*, 817 F.3d 328, 334 (7th Cir. 2016) ("A settlement agreement may be enforceable despite the omission of certain terms so long as those terms are not material."). In other words, if material terms are left unresolved, even if both parties intended to be bound, there is no enforceable contract. *Ocean Atlantic Dev. Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983, 1000 (7th Cir. 2003), citing *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991) (offers without material terms would be unenforceable even if parties intended signed offers to bind them).

Courts look to whether the parties have objectively manifested an intent to be bound by all material terms in the contract. *Citadel Group Ltd. v. Washington Regional Med. Ctr.*, 692 F.3d 580, 589 (7th Cir. 2012); Restatement (Second) of Contracts § 212 cmt. a (1981) ("But the relevant intention of a party is that manifested by him rather than any different undisclosed intention."). And we look at the parties' intent to be bound and the agreement on the material terms *at the time of contracting*, not its aftermath. *Alpha Therapeutic Corp.*, 164 F.3d at 387–89.

The central legal question here is how we should decide which terms the parties considered to be material. This question must be answered "in the context of the particular contract and the precise dispute." E. Allan Farnsworth & Zachary Wolfe, Farnsworth on Contracts § 6.07 (4th ed. 2026). The court must step into the shoes of the parties and evaluate materiality based on what the parties have indicated they find important, rather than making the assessment from our own

perspective or general abstractions. See *PFT Roberson, Inc. v. Volvo Trucks North America, Inc.*, 420 F.3d 728, 731 (7th Cir. 2005) ("And whether extra elements *are* essential is for the parties themselves to say…."); *Shann v. Dunk*, 84 F.3d 73, 79 (2d Cir. 1996) (determining materiality of contract terms "in accordance with economic reality and the views of the parties").

Generally, places helpful to look are "(1) the language used, (2) the circumstances surrounding the transaction, and (3) the purpose that [the parties] sought to accomplish." 1 Williston on Contracts § 4.36 (4th ed.); see generally Brian A. Blum, *The Protean Concept of Materiality in Contract Law*, 2020 Mich. St. L. Rev. 643 (2020) (compiling sources showing that materiality can vary depending on the nature of the contract dispute). Material terms are those that materially change the substance of the agreement or affect a party's intent to be bound by the agreement, as shown by the evidence. See *KR Enterprises, Inc. v. Zerteck Inc.*, 999 F.3d 1044, 1054 (7th Cir. 2021) (materiality is "slippery term" in contract law, so it is best to assess materiality of breach by focusing "on consequences and remedies"); Restatement (Second) of Contracts § 33 cmt. b (1981) (courts should not step in to supply terms where the matter "has been the subject of controversy between parties," but might be more appropriate where matter was raised "only as an afterthought").[2]

---

[2] Our reasoning here applies when the dispute is whether the parties have agreed to a binding contract. On the other hand, when there is no doubt a contract exists—such as where performances have actually been exchanged—courts face somewhat different problems and use additional methods to determine the terms of the contract. See, e.g., U.C.C. § 2-207(3)

Where courts typically review an informal agreement to determine whether the material terms are sufficiently definite, here we have even less: a barebones email exchange that fails to mention terms other than the price and release of claims. Pilgrim's contends that an enforceable settlement agreement resolving damages claims requires only two material terms: the payment amount and the release of claims. The district court was persuaded by Pilgrim's argument and found that the "heart" of the agreement was the sum of money in exchange for release of all Sysco's claims against it.

That view may hold true in some or even many cases that are much simpler than the one here. We also do not wish to discourage parties from reaching binding agreements in principle during settlement discussions. But we cannot remove these parties' negotiations from the larger context in which they took place. See *Yash Venture Holdings, LLC v. Moca Financial, Inc.*, 116 F.4th 651, 658 (7th Cir. 2024) ("The question of whether any given term may or may not be material is highly fact-dependent…."); *Alpha Therapeutic Corp.*, 164 F.3d at 389 (no binding settlement agreement, in part because "magnitude of [the] deal require[d] careful scrutiny of any claim that informal letters in the course of freewheeling settlement negotiations constitute a binding agreement"); *PFT Roberson*, 420 F.3d at 730 (no binding agreement, recognizing party wanted full written agreement because "caution is to be expected in a multi-million-dollar deal that would last for many years").

---

(discussing the terms of a contract for sale when parties perform despite indefiniteness in terms).

Here, Pilgrim's itself said repeatedly—after the supposedly enforceable deal had been reached—that it simply would not enter into a settlement that was not qualified under the Judgment Sharing Agreement. The "qualified settlement" language here was so important to Pilgrim's that it told Sysco over two months *after* the parties reached the supposedly binding agreement that it would walk away from the settlement if it were not compliant with the Judgment Sharing Agreement. That evidence by itself defeats Pilgrim's argument. Pilgrim's conduct shows this was a material term that had not been resolved at the time of the supposedly binding agreement.

Looking more broadly, the combination of the amount of money, the number of moving parts in this settlement, the effect of the open terms on the value of the parties' exchange, and the need to work through those terms all combine to show those terms were material. The $50 million payment is larger than most this court has dealt with in disputed settlements, precisely because parties have strong incentives to approach a deal of this size with caution and to work out the nuanced terms *before* consummating an agreement. Practically, it "defies logic" that a party would agree to enter a settlement agreement of this magnitude based on three emails with only two material terms. See *Citadel Group Ltd.*, 692 F.3d at 590 (no binding agreement where parties did not sign leases with price terms, given "complex multi-million dollar construction project and long-term lease-back arrangement").

Instead, as of September 9, 2022, there were still at least four material terms left unresolved: compliance with the Judgment Sharing Agreement, the volume of assignments,

the "most favored nation" clause, and the allocation of the
global settlement sum.

### A. *Joint Settlement Agreement*

Undisputed evidence of Pilgrim's statements and conduct
shows that the Joint Settlement Agreement provision was a
material term left open when Flynn "accepted" the global set-
tlement offer on September 9, 2022.

Pilgrim's had made clear that it considered the provision
making the settlement qualified under the Judgment Sharing
Agreement to be material, including by making an early offer
expressly contingent on this provision. Most telling is Pil-
grim's conduct following Flynn's "We accept" email, which
does not conform to its assertion that a binding agreement
had been reached. First, during negotiations, Sysco proposed
narrowing the Judgment Sharing Agreement qualification
language in the settlement agreement. In response, Pilgrim's
did not assert that Sysco had already agreed to that provision
as part of a binding agreement. Rather, as noted, Pilgrim's
said it would walk away from the supposedly binding deal
without satisfactory language on this issue.

Second, recall that the Judgment Sharing Agreement re-
quires the settling defendant to provide written notice of a
signed settlement agreement to the other Judgment Sharing
Agreement defendants within seven days of reaching that
agreement. We see no evidence that Pilgrim's ever attempted
to satisfy this Judgment Sharing Agreement term. More to the
point, Pilgrim's has not offered any theory for concluding that
its supposed deal with Sysco satisfies that requirement. Given
Pilgrim's firm insistence that the Judgment Sharing

Agreement be satisfied by its agreement with Sysco, Pilgrim's actions back then are flatly inconsistent with its position now.

The openness of this term, and Pilgrim's conduct surrounding enforcement of the Judgment Sharing Agreement requirements, is enough by itself to reverse the district court's judgment. The three other open terms similarly warrant reversal.

### B. *Assignments*

Pilgrim's argues that, contrary to plaintiff's assertion, the agreement was not contingent on the content of the assignment data. This assertion is inconsistent with the logic of the supposed deal and with the parties' actions.

First, and most central, the assignments have a direct effect on the value of the exchange of money for releases. The assignment data told Pilgrim's which claims Sysco still possessed and therefore could release, making the data critical to the value of the most central term: Sysco's release of its claims for the $50 million price. See *Alpha Therapeutic Corp.*, 164 F.3d at 388 (finding that "details" of release provisions are "inherently material" in settlement of complex case). The release of claims was not only material for Pilgrim's but the very core of the exchange for Pilgrim's. Yet Pilgrim's arguments in this appeal do not address the fact that the volume of the assignments would directly alter the value of such a release to Pilgrim's.

Second, in November 2022 in the negotiations on a definitive agreement, Pilgrim's outside counsel said to Flynn and Sysco's outside counsel that any proposed settlement ratio was not final until Pilgrim's received Sysco's full assignment data. Back in June 2022, Pilgrim's had also conditioned one of

its prior settlement offers on full knowledge of Sysco's assignment data. These communications show objective manifestations of the significance Pilgrim's placed on having this information showing an acceptable volume of assignments. Yet Pilgrim's did not have this key information as of September 9, 2022.

Third, the assignment data were also necessary to calculate the "most favored nation" ratio, which Pilgrim's calculated depending on the volume of sales to Sysco, accounting for any assignments. In other words, the volume of assignments would change the estimated volume of sales used to calculate a settlement ratio that would or would not trigger payouts to other *Broilers* plaintiffs with whom Pilgrim's had settled earlier. The importance of the assignments to the settlement ratio explains, then, Pilgrim's repeated requests for Sysco's assignment data before and after September 2022, and its circulation of the draft written agreements only after it had obtained the *Broilers* assignments and could estimate the *Beef* and *Pork* assignments.

The materiality of this term at the time of the supposed binding agreement is not affected by the fact that the parties later agreed on the term. What matters is the status of the term when the parties supposedly reached a binding agreement. It is not difficult to imagine that Sysco might have reported to Pilgrim's higher volumes of assignments than Pilgrim's had anticipated or assumed. In that scenario, we have no doubt, Pilgrim's would have insisted and would have been entitled to insist on a reduction of the $50 million payment. The uncertainty about this effect on the value of the exchange at the time of the supposed binding agreement shows this open term was in fact material.

C.  *"Most Favored Nation" Clause*

Pilgrim's says that the parties had agreed upon inclusion of a "most favored nation" clause at the time the settlement agreement was reached. But mutual assent to the inclusion of some sort of "most favored nation" clause is very different from agreement on the actual substance of such a clause, especially where the substance directly affects the overall value of the settlement to both parties. Sysco had told Pilgrim's that it considered the "most favored nation" clause to be a material term of the settlement. Sangalis Decl. ¶ 17. A "most favored nation" clause that gave Sysco a more valuable settlement ratio would have been costly to Pilgrim's, requiring Pilgrim's to pay more to other *Broilers* plaintiffs with whom it had settled earlier using settlement ratios lower than the effective ratio with Sysco.

After Flynn sent his "We accept" email, the parties continued for months to negotiate the scope of the "most favored nation" clause. Pilgrim's itself changed the scope of the "most favored nation" clause over the course of those negotiations, first omitting it, and then negotiating which *Broilers* plaintiffs would fall under the definition of a "Substantially Similar Direct Action Plaintiff" in the agreement. These changes were not immaterial quibbles, given that the language of the provision altered Sysco's ability to recover in the future for Pilgrim's later settlements and Pilgrim's potential obligation to pay more to previously settling plaintiffs if its Sysco agreement contained a higher settlement ratio. Again, we do not evaluate materiality based on whether, in the end, the parties reached agreement on a term. The record shows that important aspects of the "most favored nation" provision,

materially affecting the parties' obligations under the pro-
posed settlement, remained open as of September 9, 2022.

D.  *Allocation Among Three Cases*

We also agree with plaintiff's argument that the allocation
of the $50 million global settlement among the three cases—
*Broilers*, *Beef*, and *Pork*—was material. Pilgrim's tries to refute
this assertion by citing a Section 1983 case involving a $6,000
settlement offered to members of one family in exchange for
release of their claims against a police officer and a restaurant
owner after an altercation at a restaurant. *Elustra v. Mineo*, 595
F.3d 699 (7th Cir. 2010). There, we reviewed de novo the dis-
trict court's finding of a valid agreement between the parties
and determined that the allocation of the $6,000 among the
plaintiff family members was not a material term. *Id.* at 709.
Again, in this $50 million settlement for claims involving
three large commercial industries, the allocation would affect
the rights of the defendant and of other plaintiffs in three an-
titrust actions. In this different context, we are not compelled
to reach the same result on materiality.

Like the assignment data, the amount allocated to the
*Broilers* case was important to the "most favored nation" set-
tlement ratio. The ratio calculation divided the *Broilers* alloca-
tion by the *Broilers* volume of sales. The resulting ratio af-
fected the value of Sysco's settlement and Sysco's ability to
recover if Pilgrim's later settled on more favorable terms with
similarly situated *Broilers* plaintiffs, which Sysco viewed as
material. Further, the allocations required each party to deter-
mine the worth of Sysco's claims in each of the three cases.
Prior settlement offers show the parties did not agree upon
those. The parties had not agreed on allocations by the time
Pilgrim's circulated a first draft of a written agreement, let

alone by the time of Flynn's "We accept" email on September 9, 2022. As a result, although the parties agreed on the global settlement amount, the specific allocation of that amount to each group was a material term, left open at the time the parties agreed to the $50 million sum.

### E. *Reliance on Later Drafts*

Finally, we reject Pilgrim's argument that we can fill in material blanks by looking to the settlement drafts from December 2022 to show mutual assent to all material terms. Illinois law requires material terms to be definite at the time the supposedly binding agreement was reached, without indication from the parties that further negotiation on material terms was to follow. *Alpha Therapeutic Corp.*, 164 F.3d at 387–89. In other words, we cannot substitute a party's assent to material terms in later drafts for the party's lack of assent at the time the agreement was said to have been reached. Each of those later drafts said it would not be binding on the parties unless and until it were signed by the parties, which never happened.

Contrary to Pilgrim's argument and the district court's judgment, the parties continued to negotiate terms they said were essential long after the "We accept" email in September 2022. The evidence also shows that Pilgrim's repeatedly followed up in January 2023, after Burford had obtained a TRO preventing Sysco from executing any agreement, and threatened to revoke its settlement *offer*. Pilgrim's theory would require us to ignore the integration clause in all of those drafts. Its reliance on later agreements on particular issues shows the holes that existed on September 9, 2022, and those holes undermine its theory that the parties had agreed by then on all material terms.

To sum up, the August and September 2022 exchanges and objective expressions of the parties show an agreement in principle on the most important terms but not all material terms, which the parties expected to and did continue to negotiate for months. When given the opportunity during oral argument, Pilgrim's did not point us to a disputed issue of material fact in the record. Accordingly, we reverse the district court's judgment as a matter of law.

That leaves the small matter of the $50 million. Plaintiff Carina Ventures has said it is willing and able to return Pilgrim's funds. Pilgrim's has not argued that its payments to Sysco somehow prevent Carina Ventures from seeking what amounts to rescission of the deal as found by the district court. Nevertheless, our decision here is contingent on Carina's immediate tender of the settlement amount to Pilgrim's. We will not issue the mandate accompanying this opinion until plaintiff confirms that $50 million has been deposited into escrow with the district court (or with another escrow agent acceptable to both parties), to be released to Pilgrim's upon issuance of our mandate. To the extent Pilgrim's might believe it is entitled to interest on the $50 million, it can pursue the issue with Carina Ventures or in the district court, but we will not delay remand pending any question about interest.

The judgment of the district court in favor of Pilgrim's Pride is REVERSED and this case is REMANDED for further proceedings consistent with this opinion. We will hold our mandate as indicated above.

MALDONADO, *Circuit Judge*, concurring in the judgment. There is nothing technically wrong with the majority opinion's approach. Nevertheless, the opinion skims over much of the context giving rise to Carina's role in this case as well as the complex procedural posture surrounding the order under review. But, as the majority notes, the central legal questions here should be decided within "the context of the particular contract and the precise dispute." Maj. Op. 13 (quoting E. Allan Farnsworth & Zachary Wolfe, Farnsworth on Contracts § 6.07 (4th ed. 2026)). Therefore, I write separately to fill in the context that explains how we got here—a postmortem of sorts.

## I.

First, it bears stating the obvious: Sysco and Pilgrim's were on the cusp of finalizing a settlement agreement before the intervention of Sysco's litigation funder, Burford Capital Limited. As we've explained elsewhere, "[l]itigation funding involves a financial arrangement where, in the typical circumstances, third parties unrelated to a lawsuit provide plaintiffs with capital to cover their costs. In return, the funder receives a portion of the settlement or judgment if the case is successful." *Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 721 (7th Cir. 2025). Here, Sysco and Burford entered into a Capital Provision Agreement ("CPA") through which Burford invested more than $140 million in exchange for a share of the proceeds from a favorable settlement or judgment in the *Broilers*, *Pork*, and *Beef* antitrust litigations. Order at 6–7, *In re Pork Antitrust Litig.*, No. 18-cv-1776, ECF No. 2104 (D. Minn. Feb. 9, 2024). The CPA required Sysco to immediately communicate to Burford any settlement offers Sysco received and prevented Sysco from accepting a

settlement "without [Burford's] prior written consent, which shall not be unreasonably withheld, provided however, that [Burford] shall have no right to exercise control over the independent professional judgment of its Nominated Lawyers and shall not seek to impose a commercially unreasonable result." Declaration of Barrett G. Flynn in Support of Petition to Vacate Arbitration Award at ¶ 9, *Sysco Corp. v. Glaz LLC, et al.*, No. 1:23-cv-01451, ECF No. 1-1 (N.D. Ill. Mar. 8, 2023).

In late August 2022, Sysco informed Burford that it had negotiated a settlement with Pilgrim's to resolve the *Broilers* case, but Burford, thinking the $50 million settlement amount too low, withheld its approval. Shortly thereafter, Burford filed a Request for Arbitration, seeking to block Sysco from settling. According to Sysco's lawyers, Burford refused to provide any information supporting its assertion that the $50 million *Broilers* settlement was too low. As a result of Burford's interference, Sysco contends it was "forced to indefinitely litigate against its will against key suppliers who have offered fair and reasonable settlement payments to Sysco, all the while risking adverse court rulings, the decline of the value of Sysco's claims, and harm to important business relationships." *See* Amended Petition to Vacate Arbitration Award ¶ 74, *Sysco Corp. v. Glaz LLC, et al.*, No. 1:23-cv-01451, ECF No. 18 (N.D. Ill. Mar. 20, 2023). Eventually, Sysco—in an attempt to extricate itself from further litigation—reached an agreement with Burford under which Sysco's claims were assigned to Carina, which is indirectly owned by Burford.

Litigation finance is a relatively new industry, first emerging in the United States in 2006. *A Brief History of Litigation Finance*, at 5, Harvard Law Sch. Ctr. Legal Profession (2019) [https://perma.cc/PZ2Y-7MFD]. Burford is the market leader

in litigation finance, and as of 2024, it reported a portfolio of over $7 billion in commercial litigation and arbitration assets. Burford Capital, *Legal finance at 15: Global law firm professionals on the state of the industry* (Oct. 1, 2024), [https://perma.cc/V54B-6TGJ]. Litigation finance no doubt can offer significant benefits such as providing smaller entities and individuals the chance to have their day in court where they would otherwise be kept out by ever-increasing litigation costs. But this case presents perhaps the foremost danger of litigation finance: funders aggressively interfering with, and exerting control over, ongoing litigation, while rejecting the funded party's preferences with the hope of maximizing returns. As the Chamber of Commerce explained as amicus in *Sysco Corp. v. Glaz LLC*, "third-party funders often have different interests than the parties in the case, and this divergence of interests naturally incentivizes funders to take control of litigation in order to maximize the return on their investment." Brief *Amicus Curiae* of the Chamber of Commerce of the United States of America in Support of Petition to Vacate the Arbitral Award at 2, No. 1:23-cv-01451, ECF No. 36 (N.D. Ill. Mar. 29, 2023).

I say all of this to flag that Carina's—that is, Burford's—appeal before us is motivated far more by its speculative financial investment than by a desire to seek justice for Sysco, the true injured party. Having turned the courtroom into a trading floor, and calculated that continued litigation was more profitable than settlement, Burford wrested total control over the settlement of Sysco's claims. And but for this legal maneuvering, this litigation could have been resolved long ago. This case is a cautionary tale to any party who seeks to fund its litigation through a third party.

## II.

Second, two procedural oddities complicated this case, and both worked to Pilgrim's disadvantage. First, the District Court, arguably most familiar with all aspects of this litigation, never analyzed whether an enforceable settlement agreement existed under the summary judgment standard. Second, because we previously dismissed Carina's appeal of the settlement order for lack of jurisdiction due to the order's procedural defects, Carina effectively made an end-run around the abuse of discretion standard by teeing up the issue of enforceability at the summary judgment stage, ultimately triggering our *de novo* review on appeal. All of this is concerning, and perhaps a preferable approach would have been to remand to the District Court to conduct the proper summary judgment analysis in the first instance. The background provided below is lengthy but necessary, I think, to grasp the procedural irregularities of this case.

This saga began when the District Court, sitting as trier of fact and applying Illinois's preponderance of the evidence standard, found that a settlement agreement existed between Pilgrim's and Sysco and granted Pilgrim's motion to enforce it. *See Mulliken v. Lewis*, 615 N.E.2d 25, 27 (Ill. App. Ct. 1993) (Under Illinois law, "[w]hether a contract exists, its terms, and the intent of the parties are *questions of fact* for the trier of fact.") (emphasis in original) (collecting cases); *Panko v. Advanced Appliance Serv.*, 371 N.E.2d 3, 6 (Ill. App. Ct. 1977) (the party alleging the existence of a contract has the burden of establishing its existence by a preponderance of the evidence). Specifically, the District Court stated, "[t]he question is whether the steps the parties completed—the emails and drafts exchanged—are sufficient to establish an agreement

from an objective perspective[,]" and "[t]he objective facts here are emails from August, September, and December 2022 that demonstrate an agreement." R. 7272 at 2-3 (quoting *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007)). Weighing the evidence, the District Court added that even though the written draft settlement agreements "were never signed," "the parties indicated their agreement by email," and "[t]hat is sufficient objective evidence of an agreement to enforce it." *Id.* at 3.

Carina appealed the settlement order, R. 7287, but, meticulous about procedural compliance, we dismissed the appeal for lack of jurisdiction, determining that the District Court did not comply with Rule 65(d) of the Federal Rules of Civil Procedure. R. 7373 at 2. We held *sua sponte* that the settlement order did not "describe in reasonable detail the acts restrained or required," nor did it "set forth" the injunction "in a document separate from the court's opinion." We concluded that these failures "'render[ed] the order issued by the district court not an injunction and place[d] [appellants] under no obligations.'" *Id.* (quoting *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 320 (7th Cir. 1995)).

We did not "order a limited remand with instructions to enter the injunction on a document separate from the opinions." *Cf. MillerCoors LLC v. Anheuser-Busch Companies, LLC,* 940 F.3d 922, 923 (7th Cir. 2019) (dismissing appeal for lack of jurisdiction due to order's non-compliance with Rule 65). Nor did Pilgrim's move to bring the settlement order into compliance with Rule 65 once appeal of that order was no longer pending, as would have been permitted under Rule 60(a). Nor did the District Court—which, at that time, was fielding almost daily filings—do so *sua sponte*.

Had the District Court's settlement order complied with
Rule 65, we would have had appellate jurisdiction, and we
would have reviewed the order under the highly deferential
abuse of discretion standard. *See Carr v. Runyan*, 89 F.3d 327,
331 (7th Cir. 1996) (citing *Wilson v. Wilson*, 46 F.3d 660, 664,
(7th Cir. 1995)) ("[I]n considering a district court's decision
whether to enforce a settlement agreement, including its
threshold determination of whether the parties actually en-
tered into a valid and enforceable agreement, we will not re-
verse unless the lower court abused its discretion.").

Instead, the parties were left in an odd limbo. The District
Court had clearly decided in favor of Pilgrim's, but, per our
order, the defects in the District Court's order rendered it es-
sentially impotent.

Just five days after we dismissed its appeal, Carina moved
to vacate the District Court's settlement order. R. 7365-1. The
District Court denied the motion and encouraged Pilgrim's to
"file a motion" with the District Court "[t]o the extent [it] con-
tinue[d] to seek relief from the [District] Court." R. 7421. This
could be viewed as an invitation for Pilgrim's to file a Rule
60(a) motion to bring the settlement order into compliance
with Rule 65. But, two weeks later, Pilgrim's instead moved
for summary judgment on Carina's claims. R. 7430-1. The mo-
tion, as the majority observes, "was not framed" as a motion
for summary judgment. Maj. Op. 11. In particular, the motion
consisted of slightly over two pages of text, and the attached
statement of undisputed material facts was just three para-
graphs. R. 7431-1; R. 7431-2. No fact was alleged or argument
made as to the enforceability of the settlement agreement. In-
stead, the motion for summary judgment stated that because
the District Court had enforced the settlement agreement, and

because Pilgrim's had paid the $50 million owed thereunder, Pilgrim's was entitled to summary judgment and dismissal of Sysco's claims against Pilgrim's. R. 7431-1 at 2. In effect, Pilgrim's was asking the District Court to perform Carina's end of the bargain under the settlement agreement.

The District Court granted Pilgrim's motion, construing it as, effectively, an effort to enforce the settlement order, noting, consistent with our order dismissing Carina's appeal, that "Pilgrim's might have made a motion for the Court to enter judgment under Federal Rule of Civil Procedure 65(d) specifically stating 'the act or acts restrained or required,'" but "[i]nstead, Pilgrim's more straightforwardly seeks dismissal of the claims against it[.]" R. 7451 at 4. In key part, the District Court held that the issue of the enforceability of the settlement agreement was irrelevant because "the Court already considered it on Pilgrim's initial motion to enforce the agreement," and there, "[t]he Court found sufficient evidence of agreement based on an email exchange that took place after the August phone call Carina relies on in opposition to this motion." *Id.* at 2. And in support of applying the factual determinations from the settlement order to the summary judgment order, the District Court stated, "[h]ad the Court identified a genuine issue of material fact on the motion to enforce, the Court would not have granted the motion and would have scheduled an evidentiary hearing or trial so that the necessary findings of fact could be made." *Id.* at 3.

The expediency of transposing one similar order into another is understandable given the demands on the District Court, but the preponderance of the evidence standard that the District Court applied in the settlement order is different from the summary judgment standard. Carina had flagged

the potential for this mismatch of standards in its response to Pilgrim's motion for summary judgment, arguing that the District Court's prior order was inapplicable at the summary judgment stage because it "did not apply summary judgment standards" and "[i]nstead, sitting as the trier of fact, the [District] Court concluded that there was 'sufficient objective evidence of an agreement to enforce it.'" R. 7438 at 9 (quoting R. 7272 at 3). Carina was right. At no point did the District Court assess whether there was any genuine issue of material fact that might have precluded enforcement of the settlement agreement.

Carina timely appealed, and despite the confusion described above, because the District Court's order purported to grant summary judgment, we are exercising *de novo* review. As a result, Carina is extracting a substantial victory, effectively circumventing the abuse of discretion standard that we would have applied in our review of the settlement order had the District Court complied with Rule 65(d). This is troubling because we have expressly rejected *de novo* review of settlement orders. *See Dillard*, 483 F.3d at 506 (citing *Hakim v. Payco-Gen. Am. Credits, Inc.*, 272 F.3d 932, 935 (7th Cir. 2001)).

Because the District Court's order came to us in this highly unusual posture, a more restrained approach might have been for us to remand this matter to the District Court to conduct the summary judgment analysis in the first instance, because of its experience managing this complex multi-district litigation for years. *See, e.g.*, *United States v. Reed*, 349 F.3d 457, 466 (7th Cir. 2003) ("Because the determination involves issues of fact as well as law, they are more properly addressed by the district court in the first instance."); *Henry v. Hulett*, 969 F.3d 769, 788 (7th Cir. 2020) (reversing and remanding "for

the district court to assess in the first instance whether Plaintiffs have demonstrated that an issue of fact exists" as to the key legal claims in question). Such an approach might also have allowed for containment of the ripple effects of our decision to the *Pork* and *Beef* litigations in the District of Minnesota.

Ultimately, I cannot fault the majority for applying *de novo* review to an order purporting to decide a motion for summary judgment. But I concur in the judgment reluctantly because the tangled procedural posture before us is ill-suited for our intervention and is the result of gamesmanship, including by a third-party litigation funder. It also strikes me that if the parties are back to square one before the District Court, it might be in the interest of equity for the parties to explore on remand whether Pilgrim's is entitled to interest on the $50 million that Carina accepted for this supposed settlement back in August 2024.